David **SHPARGEL**, Plaintiff,

v.

**STAGE & CO.** and Steven Goldberg, jointly and severally, Defendant.

**Civil Action No. 95–40309.**

United States District Court, E.D. Michigan, Southern Division.

Jan. 31, 1996.

Peter B. Kupelian, Kupelian, Ormond & Magy, P.C., Southfield, MI, for Stage Co.

Peter B. Kupelian and Carol M. Garrett, Kupelian, Ormond & Magy, P.C., Southfield, MI, for defendants Stage & Co. and Steven Goldberg.

Darcie R. Brault, Barry S. Fagan, Dib & Fagan, Detroit, MI, for plaintiff David Shpargel.

### MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

GADOLA, District Judge.

Plaintiff Shpargel was employed by defendant Stage & Co. (hereinafter "Stage") for approximately ten years before being fired by Stage's president and manager, defendant Goldberg, on September 13, 1994. Plaintiff brought this suit alleging that the termination violated the both ADA and Title VII.[1] Defendants now bring the present motions for summary judgment, dismissal of defendant Goldberg, and partial summary judgment as to damages. Pursuant to Local Rule 7.1(e)(2), this court will dispense with oral argument and decide this matter on the papers submitted by the parties. For the reasons stated below, this court will grant in part and deny in part the defendants' motions.

### I. Factual Background

Stage is a restaurant, delicatessen, and catering facility located in West Bloomfield, Michigan. It was established in 1962 by the parents of defendant Steven Goldberg, Jack and Harriet Goldberg. In July, 1983, plaintiff was hired by Jack Goldberg for a carryout counter position at Stage. After one year, plaintiff left Stage, but returned in 1985 and became the carryout counter manager. Jack Goldberg died in Spring, 1994, and defendant Goldberg began to manage the restaurant. Plaintiff remained the carryout counter manager until his termination in September, 1994.

Plaintiff's responsibilities at Stage included cutting, slicing and otherwise preparing carryout food orders, ordering produce, meats, and supplies, and supervising carryout counter employees. Plaintiff also acted as a "handyman," fixing various items around Stage that would break and installing locks. Plaintiff was diagnosed with carpal tunnel syndrome during the period of his employment with Stage, but was able to continue to work from approximately 8:00 a.m. to 4:00 p.m. six days per week. Plaintiff states that he is unable to work for more than eight straight hours, chopping and slicing, as a result of the carpal tunnel syndrome. Apparently, however, plaintiff did work overtime on various occasions throughout the period of his employment at Stage. Additionally, plaintiff spends several hours per month working for Cookies–N–Baskets, a gift basket business he owns.

On September 13, 1994, plaintiff was fired from Stage by defendant Goldberg. This occurred on the day before Yom Kippur, a Jewish holiday which was one of Stage's busiest periods of the year. Stage sells many deli trays to customers observing Yom Kippur, requiring employees to work overtime in order to prepare these trays. Plaintiff was fired after a discussion between himself and defendant Goldberg about the plans for preparing the Yom Kippur trays. Plaintiff asserts that he prepared a plan for the preparation of the trays and had previously communicated the plan to defendant Goldberg, but that defendant Goldberg did not follow the plan and did not schedule the necessary people to work. Plaintiff further asserts that defendant Goldberg told him that he would have to stay and make the trays himself. Plaintiff allegedly informed defendant Goldberg that he would be unable to work overtime to prepare the trays because of his carpal tunnel syndrome. Additionally, plaintiff asserts that the preparation of the trays would necessarily have entailed his missing Yom Kippur services. Apparently plaintiff was not specifically told by defendant Goldberg that he could not attend Yom Kippur services. Plaintiff alleges that defendant Goldberg fired plaintiff after hearing that he would not work overtime.[2] Two other em-

---

1. The complaint also alleged various state law causes of action over which this court declined to exercise supplemental jurisdiction.

2. Defendants disagree with plaintiff's descriptions of the meeting that occurred on September 13, 1995 between plaintiff and defendant Goldberg. Defendants claim that plaintiff had

ployees, one of whom was Jewish, worked overtime to complete the trays. The trays were completed by approximately 9:00 a.m. the following day.

After being terminated, plaintiff filed for unemployment benefits. The MESC denied his application because the MESC believed that plaintiff was fired for disregarding the employer's best interest. Plaintiff also filed for and received workers' compensation benefits beginning from the day that he was terminated by Stage. Plaintiff has received workers' compensation of $475.00 per week from September 14, 1994 until June 19, 1995 and of approximately $325.00 per week since June 19, 1995. In June, 1995 plaintiff began working for his brother-in-law at Baker's Choice Co. as a cookie stacker. After accepting employment at Baker's Choice, plaintiff did not seek other employment. In the nine months between his termination at Stage and his acceptance of a position at Baker's Choice, plaintiff underwent two surgeries to improve his carpal tunnel syndrome. During this nine month period, plaintiff also sought employment by viewing job listings in the newspaper and at MESC, sending out a few cover letters, speaking informally with a couple of people about the possibility of working for them, and formally interviewing with two companies. Plaintiff received and accepted a job offer from one of the companies with whom he interviewed, Europa Market, but quit after two days because the position was not what he expected and because he had difficulty doing some of the hands on work that the job required.

On September 21, 1994, plaintiff filed a Charge of Discrimination with the EEOC, alleging that he was fired due to his religion and handicap. On January 13, 1995, the EEOC denied plaintiff's claim. On February 28, 1995, plaintiff filed the present action before this court.

## II. Standard of Review

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984) (citation omitted). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir.1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). This burden "may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg*, 801 F.2d at 861.

To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme

developed no plan for preparing the Yom Kippur trays. When asked why no plan had been developed, plaintiff replied that since defendant Goldberg did not care about Stage, plaintiff shouldn't have to care about Stage. It was then that defendant Goldberg fired plaintiff. Defendants also allege that this statement by plaintiff

was merely one of a long series of incidents in which plaintiff demonstrated insubordination to defendant Goldberg. Further, defendants allege that plaintiff has a long history of substandard performance with regard to his interaction with Stage's customers and other employees.

Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986),

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Citations omitted). *See Catrett*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The evidence itself need not be the sort admissible at trial. *Ashbrook v. Block*, 917 F.2d 918, 921 (6th Cir.1990). However, the evidence must be more than the nonmovant's own pleadings and affidavits. *Id.*

### III. Analysis

### A. Plaintiff's ADA Claim

■ The burdens of proof placed on the parties to a claim of discrimination under the ADA are: first, that the plaintiff make a prima facie case of discrimination; second, that the defendant demonstrate a legitimate, nondiscriminatory reason for its actions; and third, that the plaintiff demonstrate that the reasons proffered by the defendant are a pretext for the alleged discriminatory reason. *Sherman v. Optical Imaging Systems, Inc.*, 843 F.Supp. 1168, 1180–81 (E.D.Mich.1994) (citing *Roush v. KFC Nat'l Mgt. Co.*, 10 F.3d 392, 396 (6th Cir.1993)).[3] Thus, if the plaintiff can prove a prima facie case of discrimination by a preponderance of the evidence, then the defendant must adduce evidence of a nondiscriminatory reason for its actions. Once the defendant has done this, the burden is on the plaintiff to prove by a preponderance of the evidence that the defendant's reason is a pretext for the alleged discriminatory reason.

■ The ADA proscribes discrimination "against a qualified individual with a disability because of the disability of such individual

in regard to ... discharge of employees...." 42 U.S.C. § 12112(a). Thus, a prima facie case for discriminatory discharge under the ADA requires a showing that: (1) the plaintiff had a disability, as defined by the statute; (2) the plaintiff was a qualified individual, as defined by the statute; (3) the plaintiff was discharged; and (4) circumstances surrounding the discharge give rise to an inference that the plaintiff was discharged because of his disability, e.g., plaintiff was replaced by a non-disabled person, one with a lesser disability, or one whose disability is more easily accommodated. *Sherman*, 843 F.Supp. at 1181; *Fink v. Kitzman*, 881 F.Supp. 1347 (N.D.Iowa 1995). "Disability" is defined, with respect to an individual, as follows:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Further guidance with respect to the definition of disability is gleaned from the Code of Federal Regulations. 29 CFR § 1630.2 provides, in part:

(i) Major life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

(j) Substantially limits—(1) The term substantially limits means:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

(2) The following factors should be considered in determining whether an individ-

---

**3.** This analysis is common in discrimination cases and is derived from the Supreme Court's opinion in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a case involving alleged race discrimination in violation of Title VII of the Civil Rights Act of 1964.

ual is substantially limited in a major life activity:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

(3) With respect to the major life activity of working—

(i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

Based upon the above definitions, it is clear that plaintiff does not suffer from an impairment that substantially limits one of his major life activities, as defined by the ADA. Plaintiff claims that his carpal tunnel syndrome substantially limits his ability to perform manual tasks. This is not borne out by the facts, however. It is undisputed that plaintiff could work at Stage performing the manual tasks of slicing and chopping food, installing locks, and fixing various items at Stage for eight hours per day. Plaintiff's carpal tunnel syndrome only limited his ability to work longer than eight hours per day. This type of impairment does not constitute a significant restriction on plaintiff's ability to perform manual tasks or any other major life activity.[4]

It is likewise clear that the plaintiff neither has a record of having such an impairment nor was regarded as having such an impairment. 29 CFR § 1630.2 states:

(k) Has a record of such impairment means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

(*l*) Is regarded as having such an impairment means:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such a limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has none of the impairments defined in [this section] but is treated by [an employer] as having substantially limiting impairment.

The record is undisputed that plaintiff worked full days at Stage throughout his employment. While he presumably could not work for more than eight hour days because of his carpal tunnel syndrome, during those eight hours he chopped and sliced food and performed other activities around Stage, such as installing locks and repairing various items. Plaintiff puts forth no evidence upon which a factfinder could conclude that he had a record of, or was regarded as having, an impairment that substantially limited his major life activities. In assigning work to plaintiff, Stage certainly did not treat him as if he suffered from a substantially limiting impairment.

Accordingly, summary judgment is appropriate with respect to the plaintiff's ADA claim because plaintiff is unable to show that he had a disability, as that term is used in the ADA.

---

**4.** Other courts have arrived at similar conclusions when dealing with similar impairments. In *McKay v. Toyota Motor Mfg., U.S.A., Inc.*, 878 F.Supp. 1012 (E.D.Ky.1995), the court held that a woman with carpal tunnel syndrome that created a 10% loss in the use of her right arm was not disabled under the ADA. *Id.* at 1014–15. In *Fink v. Kitzman*, 881 F.Supp. 1347 (N.D.Iowa 1995), the court held that a woman with carpal tunnel syndrome that prevented her from lifting heavy objects was not disabled under the ADA. *Id.* at 1377. In *Wooten v. Farmland Foods*, 58 F.3d 382 (8th Cir.1995), the court held that a plaintiff who could only perform "light duty" work in a warm environment because of carpal tunnel syndrome could not be regarded as having a substantial limitation on his major life activities. *Id.* at 386. Thus, this court's holding is well supported by precedent.

## B. Plaintiff's Title VII Claim

 Title VII states, in pertinent part, that "it shall be an unlawful employment practice for an employer (1) to . . . discharge any individual . . . because of such individual's religion. . . ." 42 U.S.C. § 2000e–2(a). Religion is defined as follows:

The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j). "The obligation to accommodate includes efforts to accommodate those employees who refuse to work on particular days of the week because of their religious beliefs." *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir.1987).

 Analysis of a Title VII claim of religious discrimination uses a burden shifting analysis based on *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff must demonstrate a prima facie case which raises a presumption that he was the victim of discrimination. This presumption is rebutted by the defendant demonstrating that it offered a reasonable accommodation to the plaintiff or that it could not reasonably accommodate the plaintiff's religious conflict without undue hardship. *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1378 (6th Cir. 1994). Undue hardship is an easier standard than its name might suggest; any accommodation that results in more than de minimis costs to the defendant creates undue hardship. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84, 97 S.Ct. 2264, 2277, 53 L.Ed.2d 113 (1977).

 To establish a prima facie case, the plaintiff must prove: "(1) he holds a sincere religious belief that conflicts with an employment requirement; (2) he has informed the employer about the conflicts; and (3) he was discharged or disciplined for failing to comply with the conflicting employ-ment requirement." *Pyro Mining Co.*, 827 F.2d at 1085. In the present case, the defendants argue that the plaintiff has failed to demonstrate any of these three elements.

First, the defendants argue that plaintiff has failed to demonstrate a sincere belief in Judaism and in attending services for Yom Kippur. Defendants point out that plaintiff did not recognize all of the Jewish holidays and had previously worked overtime to prepare trays for Yom Kippur in 1993. Plaintiff was, however, able to attend Yom Kippur services in 1993.

 The court will not closely scrutinize the extent to which plaintiff celebrated other Jewish holidays or his knowledge about Judaism in general. In order for plaintiff to succeed on his claim, it is not necessary that this court find plaintiff to be devout in his observance of all aspects of Judaism. It is enough that plaintiff has attended Yom Kippur services in the past and wanted to attend the services in 1994. *See Cooper v. Oak Rubber*, 15 F.3d at 1378–79. Viewing the facts in the light most favorable to plaintiff, the court is convinced that plaintiff's decision to attend services on Yom Kippur derived from a sincere religious belief in Judaism.[5]

Second, the defendants assert that plaintiff has failed to prove that his religious beliefs conflicted with a requirement of work. The defendants state that plaintiff's job required that he arrange to have the Yom Kippur trays prepared, but not that he prepare them himself. Defendants fail to view the facts in the light most favorable to plaintiff. Plaintiff states that he was told that he would have to stay and complete the trays himself. Further, plaintiff asserts that, because of his carpal tunnel syndrome, he would have been unable to complete preparing the trays by himself and still attend services for Yom Kippur. Taking these statements as true, plaintiff's desire to attend Yom Kippur services would have conflicted with defendant Goldberg's mandate on the afternoon of the day before Yom Kippur that plaintiff prepare

---

**5.** Defendants make much of the fact that defendant Goldberg is Jewish, and purportedly is a more devout follower of Judaism than plaintiff. Defendant Goldberg's religion in no way pre-cludes a finding, based on other evidence, that defendant Goldberg discriminated against plaintiff because of plaintiff's religion.

the trays himself. This is true regardless of whether defendant Goldberg expressly stated that plaintiff could not attend services. A factfinder could conclude, given plaintiff's physical condition, that defendant Goldberg's alleged statements to plaintiff on the afternoon of the day before Yom Kippur were tantamount to telling plaintiff that he could not attend services. Thus, viewing the facts in the light most favorable to plaintiff, this court concludes that plaintiff has demonstrated that his religious beliefs conflicted with his work requirements.

Third, the defendants assert that plaintiff did not inform defendant Goldberg about his intention to attend services. Again, defendants fail to properly view the facts favorably to plaintiff. Plaintiff asserts in his responses to interrogatories and in deposition testimony that he informed defendant Goldberg that he would be unable to work the night of Yom Kippur in part because of his intention to attend services. Accordingly, this prong of plaintiff's prima facie case has been met.

Fourth, defendant asserts that plaintiff has not demonstrated that he was terminated for failing to comply with the allegedly conflicting employment requirement. Plaintiff has stated that he was told by defendant Goldberg that he would have to prepare the trays himself—a situation that, due in part to his carpal tunnel syndrome, would have prevented his attendance at Yom Kippur services. Plaintiff also states that he was fired immediately after telling defendant Goldberg that he intended to attend Yom Kippur services and could not, therefore, prepare all of the trays himself. This, if believed, would raise an inference that plaintiff was fired for refusing to work instead of attending Yom Kippur services. Thus, plaintiff has properly alleged a prima facie case of religious discrimination.

■ Defendants next assert that they offered plaintiff a reasonable accommodation by allowing plaintiff to arrange for the preparation of the trays however he wanted, as long as the trays were completed in a timely manner. This is another example of the defendants ignoring evidence favorable to the plaintiff, viz., plaintiff's statement that he was told by defendant Goldberg that he

would have to complete the trays himself. Under plaintiff's view of the facts, plaintiff had no accommodation. He could not work throughout the night of September 13, 1994 because of his carpal tunnel syndrome. Thus, defendant would have had to offer plaintiff the option of working with others to complete the trays. Plaintiff asserts that this accommodation was requested by the plaintiff but rejected by defendant Goldberg. Such an accommodation clearly would not have been an undue hardship because there were other employees available to prepare the trays. It would not have increased Stage's costs to have more than one person prepare the trays. Accordingly, taking the plaintiff's allegations as true, this court holds that defendants have not demonstrated that they offered a reasonable accommodation to plaintiff.

■ Defendants also argue that the evidence of plaintiff's insubordination and other related misconduct compel the court to conclude that plaintiff was fired for insubordination, not for his religious practices. While defendants have adduced much evidence of plaintiff's alleged insubordination and poor job performance, such a conclusion is not compelled. First, plaintiff's employment file was created by defendant Goldberg, in large part after plaintiff was terminated. Thus, drawing all inferences in favor of the plaintiff, the veracity of the employment file may fairly be doubted. Further, plaintiff has provided statements by other people who have interacted with plaintiff during his tenure at Stage and believe that he acted in a professional manner. This court cannot conclude that, as a matter of law, plaintiff was fired for his insubordination and not his insistence upon attending Yom Kippur services. Accordingly, defendants' motion for summary judgment with respect to plaintiff's Title VII claim will be denied.

## C. Dismissal of Defendant Goldberg

■ Defendants move for the dismissal of defendant Goldberg from this action, arguing that a Title VII religious discrimination suit may only properly be brought against a defendant employer, not an employee of the defendant employer, in his individual capaci-

ty. Title VII states that "[i]t shall be an unlawful employment practice for an employer ... to discharge any individual ... because of such individual's ... religion...." 42 U.S.C. § 2000e–2(a). Employer is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees ... *and any agent of such a person....*" 42 U.S.C. § 2000e(b) (emphasis added). The issue raised is whether an "agent" of an employer may be sued individually or only in his official capacity as an agent of the employer. This precise issue has not been expressly addressed by the Sixth Circuit, although in at least two opinions, the Sixth Circuit has commented tangentially on the subject of individual liability under Title VII. These cases will be discussed *infra.*

Initially, a discussion of those circuits which have expressly addressed this issue is informative. In *Miller v. Maxwell's Int'l Inc.,* 991 F.2d 583 (9th Cir.1993), the Ninth Circuit held that an individual may not be held liable under Title VII and the ADEA in an individual capacity. *Id.* at 587–88. Rather, the court held that "the obvious purpose" of including agents of employers in the definition of employer "was to incorporate respondeat superior liability into the statute." *Id.* at 587. The court supported its holding with the following reasoning:

> Title VII limits liability to employers with fifteen or more employees ... in part because Congress did not want to burden small entities with the costs associated with litigating discrimination claims. If Congress decided to protect small entities with limited resources from liability, it is inconceivable that Congress intended to allow civil liability to run against individual employees.

*Id.* The Ninth Circuit rejected the argument that their holding would promote violation of Title VII by agents:

> No employer will allow supervisory or other personnel to violate Title VII when the employer is liable for the Title VII violation. An employer that has incurred civil

damages because one of its employees believes he can violate Title VII with impunity will quickly correct that employee's erroneous belief.

*Id.* at 588. Indeed, the ability of an employer to control the conduct of an employee is the very reason for imposing respondeat superior liability.

In *E.E.O.C. v. AIC Sec. Investigations, Ltd.,* 55 F.3d 1276 (7th Cir.1995), the Seventh Circuit followed the reasoning of the *Miller* court in holding that individuals were not liable in their individual capacities under the ADA.[6] *Id.* at 1281. The court also stated:

> The original design of damage awards under the ADA, Title VII, and the ADEA buttresses our conclusion. Until 1991, a successful plaintiff could recover only back pay and equitable relief such as reinstatement. Those types of remedies typically are only obtainable from an employing entity, not from a mere individual. That arrangement suggests that Congress did not contemplate individual liability when it originally passed the relevant statutes.

*Id.* at 1281. Finally, the court noted that Title VII and the ADA currently have a sliding scale of limits placed on compensatory and punitive damages. The lowest cap is $50,000, applicable when the defendant has between 14 and 101 employees. There is no limitation listed for individuals. "That omission implies [Congress] did not consider individuals liable." *Id.*

Additionally, the Fifth Circuit in *Grant v. Lone Star Co.,* 21 F.3d 649 (5th Cir.1994) (analysis of Title VII), the Eleventh Circuit in *Busby v. City of Orlando,* 931 F.2d 764 (11th Cir.1991) (analysis of Title VII), and the Fourth Circuit in *Birkbeck v. Marvel Lighting Corp.,* 30 F.3d 507 (4th Cir.1994) (analysis of ADEA) have all held that individuals may not be found liable in their individual capacities under various anti-discrimination statutes.

6. While the *AIC* court was dealing with a discrimination claim under the ADA, "the ADA's definition of 'employer' mirrors the definition of 'employer' in Title VII of the Civil Rights Act of 1964 and in the Age Discrimination in Employment Act (ADEA). Courts routinely apply arguments regarding individual liability to all three statutes interchangeably." *E.E.O.C. v. AIC Security,* 55 F.3d at 1279–80.

As previously noted, the Sixth Circuit has not expressly addressed this issue. Nonetheless, in *York v. Tennessee Crushed Stone Ass'n,* 684 F.2d 360 (6th Cir.1982), the court, after reviewing various Title VII cases in which agents were found liable, stated that "these cases simply stand for the proposition that [an agent] could be sued *in his official capacity* as … agent … of the association, provided the association was the employer of 20 persons." *Id.* at 362 (dictum) (emphasis added). In *York,* the issue was whether the defendant association had enough employees to fall within the definition of "employer" under Title VII. The court held that the defendant did not employ at least 20 persons, and could not be liable under Title VII. Thus, the above-quoted language was dictum. The language does suggest, however, that under Title VII, when agents are sued, they are sued in their official capacity, not their individual capacity. This inference would comport with the aforementioned decisions of various other circuits in which individuals are not liable in their individual capacity under antidiscrimination statutes.

In *Jones v. Continental Corp.,* 789 F.2d 1225 (6th Cir.1986), however, the court, faced with a § 1981 race discrimination claim [7] and a Title VII sex discrimination claim, held that the initial complaint did not have to be amended to list specifically which individuals were being sued under which statute. The court stated that "the law is clear that individuals may be held liable for violations of § 1981, and as *"agents" of an employer* under Title VII. Since the individual employees sued were at least arguably "agents" of the employer, we think it obvious that Jones's counsel were intentionally and properly seeking recovery against the individuals under both statutes." *Id.* at 1231 (footnotes omitted) (emphasis added). The use of the phrase "as 'agents' of the employer" could be read as merely supporting the .proposition that individuals may be sued under Title VII in their official capacity as agents of the

employer, but not in their individual capacity. However, the court's conclusion that plaintiff was properly seeking recovery against the individuals under both statutes could be read as stating that individual liability under Title VII is proper.

Obviously, plaintiff and defendants take different views of the meanings of these two Sixth Circuit opinions. Having studied the cases, the court agrees with the defendants that these cases support the proposition that individuals may only be found liable under Title VII in their official capacity and not their individual capacity. Neither of these cases, however, provides strong guidance for this court and these opinions should not be viewed as clear predictors of how the Sixth Circuit would rule on this point. More telling, are the consistent holdings of other circuits that there is no liability against individuals in their individual capacities under Title VII or similar antidiscrimination statutes. *Birkbeck v. Marvel Lighting Corp.,* 30 F.3d 507 (4th Cir.1994); *Grant v. Lone Star Co.,* 21 F.3d 649 (5th Cir.1994); *E.E.O.C. v. AIC Sec. Investigations, Ltd.,* 55 F.3d 1276 (7th Cir.1995); *Miller v. Maxwell's Int'l Inc.,* 991 F.2d 583 (9th Cir.1993); *Busby v. City of Orlando,* 931 F.2d 764 (11th Cir.1991). Based on these opinions, this court is convinced that Title VII does not provide for liability against individuals being sued in their individual capacity. Rather, individuals may only be sued in their official capacity as agents of the employer, to provide respondeat superior liability. Thus, summary judgment is appropriate as to any Title VII claims plaintiff is bringing against defendant Goldberg, in his individual capacity.

### D. Partial Summary Judgment With Respect to Monetary Damages

Defendants move for partial summary judgment with respect to plaintiff's request for monetary damages. Plaintiff is currently seeking the award of "just and adequate compensation for the injuries and the dam-

---

**7.** As pointed out by defendants, "significant differences in the statutory enforcement mechanism, coverage, and remedial provisions of § 1981, as distinguished from Title VII, reveal that the breadth of one statute provides no support for divining the intent of Congress in limit-

ing coverage of the other." *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995). Thus, the language in *Jones* pertaining to individual liability under § 1981 is not relevant to this analysis.

ages sustained" from the allegedly improper termination of plaintiff from Stage. Defendants argue that summary judgment is appropriate with respect to any request for monetary damages because (1) plaintiff's workers' compensation payments fully compensated the plaintiff, and (2) plaintiff has failed to properly mitigate his damages. Plaintiff responds that (1) his workers' compensation payments were both temporary and partial, making them inadequate compensation for the loss of his job, and (2) plaintiff has attempted to mitigate damages by looking for similar employment. These arguments will be addressed in turn.

First, defendants argue that plaintiff should be limited in recovery to the workers' compensation payments he has already received. The application for workers' compensation, defendants argue, is an admission by the plaintiff that he was unable to work. Thus, defendants conclude, had plaintiff not been fired from Stage, his disability would have forced him to leave Stage and rely on workers' compensation payments as a substitute for his wages anyway.

This argument does not square with the facts viewed most favorably to plaintiff. Plaintiff alleges, quite reasonably, that his disability is both partial and temporary. As pointed out by the defendants, plaintiff's carpal tunnel syndrome only limited his ability to work more than eight hours. Thus, had plaintiff not been fired from Stage, he would not have been required to take workers' compensation because he still would have been able to perform his job.[8] It is undisputed that plaintiff's workers' compensation benefits were less than the salary that plaintiff was receiving at Stage. Thus, the conclusion is inescapable that plaintiff's workers' compensation benefits did not place plaintiff in as good a situation as he would have been in had he not been fired from Stage.

Second, defendants argue that plaintiff has failed to mitigate damages and is therefore not entitled to recovery of damages. Clearly, there is an affirmative duty to mitigate damages under Title VII. 42 U.S.C. § 2000e–5(g)(1) states that "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." This duty "operates to prevent claimants from recovering for damages which they could have avoided through reasonable diligence." *Rasimas v. Michigan Dept. of Mental Health,* 714 F.2d 614, 623 (1983).

> Once a claimant establishes a prima facie case and presents evidence on the issue of damages, the burden of producing sufficient evidence to establish the amount of interim earnings or lack of diligence shifts to the defendant. The Defendant may satisfy this burden only if he establishes that: 1) there were substantially equivalent positions which were available; and 2) the claimant failed to use reasonable care and diligence in seeking such positions.

*Id.* at 623–24 (citations omitted).

As described in the preceding sections of this opinion, plaintiff has demonstrated a prima facie case of discrimination. Further, plaintiff has presented evidence on the issue damages, viz., that plaintiff suffered a drop in income after he was terminated from Stage. Thus, the burden is on the defendants to prove that there were substantially equivalent jobs available to the plaintiff but that he failed to exercise reasonable diligence in seeking such jobs. In making this determination, the facts will be viewed in the light most favorable to plaintiff.

With respect to the first prong that defendants must prove, the availability of substantially similar positions, the Sixth Circuit has stated that, "[t]he substantial equivalent of the position from which the claimant was discriminatorily terminated must afford the

---

**8.** The surgery that plaintiff underwent to correct his carpal tunnel syndrome may have prevented him from working at Stage, but only for a finite period of time after the surgery. It seems clear that plaintiff's surgery would not have prevented him from working at Stage permanently. Thus, even if plaintiff were unable to recover monetary damages for the period of time that he was physically incapable of working at all, plaintiff would still be able to recover for the period of time in which he could work and was exercising reasonably diligent efforts to attain work similar to that from which he had been fired.

claimant virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status." *Id.* at 624. Defendants claim that the pages of newspaper classified ads which the plaintiff admittedly used to look for work after he was terminated from Stage are rife with ads for positions substantially similar to plaintiff's position at Stage. It is true that these pages contain dozens of ads for managerial positions at restaurants. Unfortunately for the defendants, they have proffered no evidence concerning whether the advertised positions offered "virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status" as plaintiff's position at Stage. The newspaper ads do not provide this court with enough information to determine whether these criteria for substantial similarity are met. While there is a strong likelihood that some of these advertised positions for restaurant managers were substantially similar to plaintiff's position at Stage, on defendants' motion for summary judgment, the court is not allowed to make that assumption. Thus, the defendants have failed to meet their burden of showing that there were substantially similar positions available.

With regard to the second requirement that the defendants must prove, plaintiff's lack of reasonable efforts at finding similar employment, the Sixth Circuit has stated:

> A claimant is only required to make reasonable efforts to mitigate damages, and is not held to the highest standards of diligence. The claimant's burden is not onerous, and does not require him to be successful in mitigation. The reasonableness of the effort to find substantially equivalent employment should be evaluated in light of the individual characteristics of the claimant and the job market.

*Id.* (citations omitted).

Defendants argue that plaintiff has not made reasonable efforts to mitigate damages because he did not take adequate steps to find employment and because he voluntarily removed himself from the job market. Plaintiff was terminated from Stage on September 13, 1994. Plaintiff began working for his brother-in-law at Baker's Choice Co. as a cookie stacker in June, 1995. After accepting employment at Baker's Choice, plaintiff stopped looking for other employment. In the nine months between his termination at Stage and his acceptance of a position at Baker's Choice, plaintiff underwent two surgeries to improve his carpal tunnel syndrome. During this nine month period, plaintiff's efforts to find employment may fairly be summarized as follows:

(1) Plaintiff sent out four brief cover letters, without resumes, to four companies who placed advertisements in the newspaper. Those companies did not respond and plaintiff did not follow up.

(2) Plaintiff spoke with two people informally about the possibility of working for them.

(3) Plaintiff attended two formal job interviews. As a result of one of these interviews, plaintiff was offered and accepted a position at Europa Market, but quit two days later because the job was not what he had expected and because he was unable to do much of the "hands on" work required by the job.

(4) Plaintiff viewed job postings at MESC, but failed to take advantage of any of the services provided by MESC to help people with a job search.

While these efforts do seem minimal, given that plaintiff had many months in which to seek employment, this court is not willing to rule, as a matter of law, that they were unreasonable or that plaintiff voluntarily removed himself from the restaurant management job market.[9] A factfinder could conclude that, given plaintiff's physical condition, the efforts that he made to find work as a manager of a restaurant were reasonable. Further, a factfinder could conclude that

---

**9.** In *Ford v. Nicks*, 866 F.2d 865 (6th Cir.1989), the Sixth Circuit held that a Title VII claimant's decision to change professions when there are substantially similar positions available to the claimant within the profession from which she had been fired, the claimant has not adequately mitigated damages and is not entitled to damages. *Id.* at 875 ("[Claimant] was perfectly free to make this choice [to change professions], of course, but under § 2000e–5(g) she was not free to impose the costs of that decision on her former employer.")

plaintiff accepted a position at Baker's Choice not because he was voluntarily removing himself from the restaurant management job market, but rather because he could not find employment substantially similar to his position at Stage.

Thus, summary judgment against plaintiff on the issue of damages is not appropriate.

Plaintiff charges that the current motions brought by the defendants are frivolous and requests the court to award attorney's fees to plaintiff. The court holds that such an award is not justified.

## ORDER

Therefore, it is hereby **ORDERED** that defendants' Motion for Summary Judgment be **GRANTED** with respect to Count III, plaintiff's claim of handicap discrimination under the ADA, and **DENIED** with respect to Count I, plaintiff's claim of religious discrimination under Title VII.

It is further **ORDERED** that Count III be dismissed with prejudice.

It is further **ORDERED** that defendants' Motion to Dismiss Defendant Steven Goldberg be **GRANTED** and that all claims against Defendant Steven Goldberg, in his individual capacity, be dismissed with prejudice.

It is further **ORDERED** that defendants' Motion for Partial Summary Judgment As To Damages be **DENIED**.

**SO ORDERED.**